Our next argument is Island Intellectual Property v. TD Ameritrade, et al., 2023, 1318 and 1441. Mr. Delaportis. Thank you, Your Honor. May it please the Court, I'm here on behalf of the appellant, Island Intellectual Property. We're appealing today from the District Court's grant of summary judgment on patent ineligibility on the 286 patent, 551 and 821. I'd like to start with 286 and I'd like to address the two-part Alice test, but I'd like to do something unusual and flip it because something extraordinary happened below. And with respect to 286, there was no two-second step Alice analysis. The magistrate pane skipped right over it. Let's look at the claims. Yes. It's managing funds. It's moving data around. It's calculating. It's what you and I probably do at home with spreadsheets. This is all abstract. It's much more than that, Your Honor. So what we're talking about here are computerized deposit sweep systems. Computerized deposit sweep systems have never been done at home. They've never been done by pen and paper. You started deposit sweeps back in the 80s. They've always been done with massive mainframe computers. It's akin to the Internet. There's no way deposit sweeps have ever been done. They necessarily require computers. And, in fact, we put them alike. The steps to get to deposit sweeps, it's just what we said. It just involves aggregating data, moving money around, making deposits, making withdrawals possible. It's actually much more than that. I think this is akin to Your Honor's dissent in MDOCS. What's the much more? I'm sorry. What's the much more? What's the much more? What's the much more? The much more, let's start with the 286 patent. The 286 patent has a few things which everyone has found unique and has never been done before. It has an unconventional and non-routine interest allocation model. It applies those to aggregated accounts, which, again, never been done before. Their expert says it's never been done before. And it does it in a way to provide pro-rad interest. And the reason this was so complicated was because you had one set of banks who were only doing their accounting on the aggregate level. You have individuals who need their accounting on the individual level, and nobody knew how to do that. It was such a technical challenge that American Express, this is in their answer, by the way, American Express, who's incredibly technically sophisticated, they came to us and said, how can we program our computers to do this? And we designed the 286 patent. We designed it for American Express. How does the patent tell you how to program a computer? I'm sorry? How does the patent tell you how to program the computer? Oh, I'm sorry. It does it two ways. One, it's basically, it's process flows. And second, it's database structure. So all these banks, they have an army of coders. Where's that in the claims? So let me take out the claim, Your Honor. We use the lettering from our brief, if that's helpful to the court. So the claim basically, I'm going to take 286 patent and claim one, basically has three parts and then a little bit of what I call a nub. A and B is what you call account management. And it's unique and unconventional. No one was doing it before us, but that's not why we got this patent. We had done it with earlier patents. Only we were doing it, but that's why we got it. Then you get to C, D, and E. C, D, and E is structuring the database. That tells the coders basically what inputs you need to put where. And this, again, the experts showed. And when we maintain, these are unique database structures, what we believe is akin to EnFish. And then you get to what the examiner said was unique, never been done before. In fact, the prior art taught away from it. And that's F and G, F, G, and H, sorry. F, G, and H is our interest allocation model. And what our interest allocation model does is it shows these coders, whoever they are, how to apply tiered interest rates in an aggregated account. So the aggregated account, it's like sometimes they're called pooled accounts, sometimes they're called underlist accounts. This is a description of the result that you want to achieve. Where does it tell you? There's a special idea here about computer programming. If we just said give people tiered interest rates, that would be a result. What F, G, and H do is tell the programmers how to do it. Which page are we talking about? So this is claim one, the 286 patent. Oh, sorry. But it's just calculation, isn't it? There are a lot of very smart ideas that because they're just ideas, they're abstract. Sorry, Your Honor. Claim one's on 248, that's all it's going to be. I'm sorry, Judge Lurie, you were saying. It may be very clever, but it's simply calculation. No, Your Honor. And it's multiple accounts and multiple interest rates. The explanation is that this was a technical challenge that the computers couldn't do. We were already doing sweeps on computers. They couldn't figure out how to do that. We just have to look at the examiner's allowance, which talks about this. This isn't us. This is the examiner. Where's the claim telling you how to program the computer? It just tells you the result that you want. What here is the programming invention? As I said, Your Honor, there's three parts. A and B is telling you how to manage the computer.  Oh, I'm sorry. Column, line. Yes, Your Honor. We are on appendix page 248, claim one of the 286 patent. That's column 27. It begins on what looks like line 11. What we did is we lettered the paragraphs. Basically, the first two maintaining paragraphs, those tell you how to structure the attempts. Again, this is for coders. It's not telling you what the result is. No, it's telling the coders how to. It's a process flow, Your Honor. It's telling people how to program the software. Well, these instructions that you want us to believe, they're not in the claims. When you look at the claims itself, and you look at paragraphs 10 through 65 of column 27, just out of the 286 patent, you're talking about maintaining a plurality of accounts. Yes. Maintaining funds for those accounts. Maintaining or accessing computer and electronic database. Yes. Receiving electronic transaction data. Updating respective balance of funds. Yes. Determining electronically the sufficiency of client funds. Yes. That's the interest. That last one you read, Your Honor, is the interest allocation model. And doing that with tiered accounts was our invention. All of that is abstract. We don't believe so, Your Honor. Maintaining accounts. If you were to obtain a pen on this, you would practically have exclusive rights to the entire system of banking or keeping a check at home. No, Your Honor. This was very specific. The specificity that you're pointing to is not in the claim. And I am going to just look at the claim first and ask you, what is the claim directed to? The claim is directed to an interest allocation model used with tiered accounts for non-prorated interest in a computerized deposit sweep system. Okay. So what does that mean? It simply means to maintain separate accounts that are interest-bearing, that permit the banker or an individual to make deposits and withdraw deposits, and that their deposits are insured up to $100,000 by the FDIC. Actually, this is about enhanced insurance. What happens here is – Would you agree with what my assessment here? No. Not at all, Your Honor. Well, show me the claims then. Okay. Where I was wrong. Okay. So where we talk about determining electronically for each of the plurality of accounts in the subset of a client account of a respective interest rate from a plurality of interest rates in an interest allocation procedure. Now, those accounts – It's telling you how to make a calculation? Within the aggregated account. It's just telling you how to make a particular calculation. Based on. Yeah. Based, at least in part, on the updated balance of the funds associated with the respective client account at the time. So these are for use in an – So what happens is I go to a broker, right? And I have my money sitting there. And I don't want my money sitting there if I'm not buying stocks or bonds. I want to get some interest. And sometimes I want to get – It was $100 when this was invented. It's now $250. So what they do is you can get your account. You can sweep it to various accounts and get some interest. But the bank on the other end, the program banks – Remember, this is a program. They didn't want to deal with 1,000 accounts. So the invention we came up with for the parent is you put them all in an aggregated account. And it makes the accounting such that the computers at the banks can handle it. Because they're just dealing with one aggregated account, one set of interest. Okay. But then you've got customers. And the customers are like, well, I want my interest. And maybe the bank wants to give a different interest for one versus the other. And this is a program flow on how to do it. Now, if I could go briefly beyond the claim, because that's Step 2. I know that there was no Step 2 analysis here. We have a lot of evidence that even if you find that it's abstract under Step 1, under Step 2 the court's required to do an analysis. They can't skip over it. If you read this here, there's a two-sentence analysis that was provided on Claim 286 by Magistrate Payne. And Judge Gilstrap added nothing to that. He simply said, Judge Payne, Magistrate Payne got it right. There's no Step 2 analysis in the report. We had inventor testimony showing how this was designed to resolve a technical challenge of processing millions of transactions simultaneously. We had expert testimony. We had their expert who said it was novel. This is an expired patent, isn't it? What's that? This is an expired patent. Yes, sir. It goes back to 1998. The other one goes to 1998. There's been a lot of law since then. 286 goes to 2002. The 551 goes to 1998, yes. So we're talking about mastering computer problems at the time. Computers are probably better now, I assume. But at the time, these were real technical challenges. The computers can handle it. But with 286, there is no Step 2 analysis. There needs to be, because we had legions of evidence we put before there. Under Berkheimer, they should have been considered. This Court has often said that you have to consider the evidence. You can't just ignore it. You are into your rebuttal time. You can continue or save it. I'm going to take two more minutes, Your Honor, if I may. So what we have here is this Court has often said it's incumbent upon the court below to state their reasons. And even if you think Claim 1, this is abstract, we still go to Claim 2. I believe Your Honor once said Step 2. Step 2 is the lifeline. That's a quote from MDOT, maybe. So Claim 2 is the lifeline. No one threw us a lifeline here, because we had lots of evidence of inventiveness. And that was never considered. We had inventor testimony, which talked about how these things worked. We had expert testimony. We had the examiner's allowance. And I'd like to just read from the examiner's allowance, because he nailed it. What he says is the closest prior art, this was something called the Onken patent before we came, actually taught away from this and complains about the complexity involved in computing the interest earned at each participating bank institution. He's talking about 103, isn't he? Well, he's not talking about eligibility necessarily. But what he's finding is that the closest prior art teaches away and complains about the complexity in computing. Everybody understood this was about computing. Now, maybe the court in its 56 had it done one, would have found all these things don't create a material dispute of fact. But that's not in either Magistrate Payne's decision or Judge Gilstrap's decision. That's not in there. Briefly, what's your argument under Step 2? What is it about the claims, the claim advance, the specification that transforms the abstract idea under Step 1 into something that's patent eligible? Your Honor, there was a unique technological challenge here. Computers of the time, we're talking 2002, could not handle these massive transactions. And if we look at the inventor testimony we have, there's just a line from it I'd like to read from you, even though I know I'm using up all my time. How did you change the computer to make it handle these massive transactions? This is software. So basically, this software allows the computer to go, we don't change the hardware. This is not a hardware invention. But it's a regular computer, right? It's not a special computer. Well, it's a regular computer that's processing software. Whatever computers banks use, what we talked about in our invention is these inventions, this software design, should be what we use called readily integrable, into the existing computer systems. So it's the bank's computers that does this super processing. That's correct. That's not what this invention is about. No. We point this out. We have another case before Judge Forrest. You can't claim that what the banks are doing is, you can't use that to support your Step 2 analysis. No, we're not, Your Honor. What we're saying is we're showing the banks how to create computer systems using their hardware, wherever they buy their hardware from, to process transactions that they were never previously able to process. These are millions of transactions a day that are happening simultaneously. This is not some sort of, you know, ledger. These can only be done on computer. The claims on their face require, quote, controlled interaction between the intermediate banks, the source banks who deal with the customers, and the program banks which hold the aggregated accounts. That was a factual finding from Judge Forrest. Now, Judge Kilstrap said, well, that's pre-Alice. Okay, it's pre-Alice. It's still a factual finding. We had to grapple with it. In real-time data, the court talked about if another judge disagrees, you've got to at least address it. Counsel, as you might see, your red light is on. I'll save 30 seconds. You don't have 30 seconds yet, but we will give you a minute of rebuttal time. Thank you. I appreciate it, Your Honor. Good morning, Your Honors. I think the most important thing to say is that most of what I just heard, millions of transactions, process flow, et cetera, is not in the claims. The claims don't require millions of transactions. And even if they did, handling millions of transactions is what computers are good at, adding up accounts, adding up transactions, summing them up over many, many accounts. That's exactly what computers are for, and they've been doing that for decades in banks. That was admitted on this record. I think the one central thing I want to draw Your Honor's attention to is that Island admitted in its briefing that its supposedly amazing interest calculation, its claims, it admitted that its claims cover any interest calculation by any computer with any database, as long as it's done in a way that allocates a different return to two different investors whose money is held in the same aggregated account. So that's the supposed innovation, giving a different return to two different investors whose money is in the same aggregated account. And then you can calculate that with any database, any computer, et cetera. They admitted that, and if you look at- Not that it's real germane to the issue, but how novel is this concept of deposit sweeps? It's not, Your Honor. So Merrill Lynch was doing deposit sweeps from the 1980s. The record contains, it's on page, if you look at page four of our brief, there's a citation to an American Bank article from 1983. That's APX 780. And it talks about how Merrill was doing deposit sweeps to 12 different banks to provide the extra FDIC coverage that you get from sweeping to many banks. So that would have been 1.2 million at the time. Did we have that Merrill Lynch patent before us years ago and uphold it? Oh, that I do not know, Your Honor. I do not know. But I think that you did. But your answer probably is that the law changed at the Supreme Court. So the Merrill patent is very old. It came two decades before this patent, and yes, Alice was after that. Alice is directly relevant to that. Now, is there no room for clever software moving data around in today's 101 world? Your Honor, I would not say that. But this case is not that case, right? This case is very simple. It doesn't need to be decided on anything other than its own facts. And here we have an admission that it covers any computer, any database that calculates interest within aggregated accounts. That's squarely within the facts of Alice. So how does it become specific? Put in zeros and ones, object code, source code, is that how it becomes specific in general? I don't think I'm prepared to tell you, Your Honor, how you could do that. What I am prepared to tell you is that wasn't done here. If you read these specifications, there's nothing innovative about a computer in these specifications. They say you use an Oracle database or you buy one from IBM. If the specification had algorithms in it, would that have made a difference? So a mathematical algorithm, absolutely not, right? So a new interest rate calculation implemented on a generic computer, this Court's precedent is very clear that implementing a new abstract idea with a generic computer component is not patentable. So the answer to that is no. I'll just give this APX citations to their admission that these claims cover any calculation. It's 309 and 310 and APPX 964. I'll also just state quickly that we do not agree. The District Court skipped step two. There's a discussion of that by the magistrate in the R&R at APPX 10. He is extending the analysis from the 551 patent to the 286 patent and explaining that the result is no different. Then there's a several-page discussion of step two. Your comment on the other side says that whatever analysis was provided by Judge Gilstrap or the magistrate, that it was insufficient or doesn't exist. Is that correct? What's your response to that? So my response to that is that is not correct. And I will give you or quote you a few brief passages to explain why that's not true. The central point that both the R&R and Judge Gilstrap made is that when the alleged innovation is in the realm of the abstract, an improved interest calculation, an improved method of managing funds, and there's no evidence that it was implemented in any way other than with a generic computer component or a generic database, the law establishes that's not enough. So even if it was an improvement in managing funds, the specifications demonstrate that it was implemented with a generic software, generic computer. What about something like evidence of commercial success? So evidence of commercial success has been credited when it is tied to the claims and it's tied to an improvement that is not itself abstract. The evidence that was presented here is evidence that they came up with an advance in the field of finance. But they have to tie, they would have to show that there was something in the claims that improved a computer in a way that wasn't using an abstract idea. And they haven't done that and they can't do that. So it seems to me a lot of times that the arguments we hear are, there's an attempt to keep the language that's being used technical. When I first read this pen, what I saw as a pen, the claim to advance, is that it helps you make more money and it safeguards your money because now you can deposit money in multiple accounts, you have the ability to make multiple withdrawals out of high-yielding accounts, and they're all FDIC insured. You know, I mean, maybe that is a system that does that. Maybe that's not abstract if it's tied in a step to with commercial success. And you have everyone on Wall Street exclaiming, this is a great system because we're all making a bunch of money. Well, so first of all, what you just described, Your Honor, was all done by Merrill Lynch in the 1980s, two decades before this. So we wouldn't concede that everything you just described was some great invention. But even if it was, there would need to be something about the operation of the computer, it would need to be tied to something specific. How about long-field need? How about if they had evidence showing that? So again, these factors that we're talking about, they have to be tied to something that's legally relevant. Those are obviousness factors, not 101 factors, right? That's true. But even if you were to analogize between the two. Have we ever done that? So no, there's no analogy drawn that I've seen. But I have seen, and the cases are cited, where there was consideration of commercial success in the context of 101. But there only when it was tied to an advance that was not itself abstract. It doesn't matter. In fact, this Court has said the opposite. It has said repeatedly that no matter how groundbreaking an advance is in the field of the abstract, so you've uncovered a piece of fetal, I forget what the fetal DNA case exactly is, but it was undisputed that this was a groundbreaking advance in the biological field. But it was, unfortunately, the advance was abstract. Well, you're mixing, that's not abstraction, that's natural law. You're right. You've got the 101 factors mixed up. I am. You're right. But the analogy, I believe, holds. If there is an advance in natural law, no matter how groundbreaking the advance, that advance in natural law doesn't confer patentability. The Supreme Court talked about an invented step, didn't they? Yes. Step two. Yes, sir. Which sounds like 103, obviousness. In fact, the statute in 1952 was to get rid of the old language of invention and put in the non-obviousness test. That's not a question. I won't respond to it then, Your Honor. Anything further? Nothing further unless you have further questions. All right. Thank you. Mr. Delaportes has indicated you have used up all your time,  It's greatly appreciated, Your Honor. Just a couple points very quickly. They now say, oh, this is just regular banking. What they told the judge on claim construction was that a person of skill in the art needed three years of computer expertise in order to understand these patents. So that's referenced in the claim construction ruling, which is a 280 to 297. So, you know, they've shifted back and forth here, and we think the original position was the correct one. Also just want to note that with regard to the technology, and Your Honor mentioned it, maybe not commercial success, but one thing that is relevant, has been found relevant, is marketplace demand and rapid industry adoption. We know that one business that rapidly adopted it was TD Ameritrade. When we got their code during discovery, they actually referenced in their code reserve funds, which is our client. They basically copied everything from us. They didn't do it before. They did it afterwards. Merrill Lynch, the record is very clear. It's not on this appeal. Merrill Lynch did something completely different. They did deposit sweeps. Lastly, just to understand what it is, and this is straight from page 1263. This is the inventor testimony. At the time, the sophisticated information technology required to perform these complex and calculation-intensive systems was cost-prohibitive for most businesses, requiring state-of-the-art computers, which in turn could cost tens of millions of dollars. During a single business day, the account management technology software must be able to arrange or manage databases so as to instantaneously allocate billions of dollars. Which says nothing about abstraction. Computerized deposits. Your time has expired. We have your argument. Okay, last line. Computerized deposit sweep systems pre-2003 were simply not up to the task. That was the technological challenge. It's on 1263. It's at least a fact issue. It was never considered by the court below, and, Your Honor, we would hope that you would send it back under Berkheimer for a proper Rule 56 analysis. Thank you. Thank you, counsel. The case is submitted.